The **NATIONAL CASH REGISTER COMPANY**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent.

No. 73–1188.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 10, 1973.

Decided March 13, 1974.

D. J. Sullivan, St. Louis, Mo., for petitioner.

Paul J. Spielberg, Atty., N.L.R.B., Washington, D. C., for respondent.

Before GIBSON and ROSS, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

ROSS, Circuit Judge.

National Cash Register Company (NCR) filed a Petition for Review of an Order of the National Labor Relations Board (NLRB) which determined that NCR had violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and 158(a)(5), in its New York City, Detroit and Duluth branches and which ordered NCR to bargain with the union at those locations. The NLRB cross-petitioned for enforcement of its order. We grant enforcement of the order as it relates to the 8(a)(1) violations, but decline enforcement of the balance of the Board's order.

NCR is a national organization with branch offices in 211 locations. In late 1969 and early 1970 union elections were held in NCR's Duluth, New York City and Detroit branches, as a result of which the Business Machine Technicians and Engineers Association affiliated with Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, AFL–CIO (hereinafter the union or BRAC), was certified as the collective bargaining agent for the technical service representatives (TSR) employed by NCR at those three locations. BRAC also was the certified collective bargaining agent for TSR at six other NCR branch offices not directly relevant to this case. On May 8, 1970, the union and NCR reached agreement on a collective bargaining contract for the calendar year 1970, which covered the units at Duluth, Detroit and New York. These contracts were due to expire on December 31, 1970, and the union notified NCR on October 16, 1970, that it desired to change and modify the contract. Because of events hereinafter described, no negotiations were held on the proposed revisions to the 1970 contract.

On July 20, 1970, BRAC filed identical charges in three different regional offices alleging 8(a)(1) violations by the company at Duluth, New York and Detroit. The allegations were that NCR, in conducting individual performance appraisals and interviews, was making promises and threats or coercing employees to leave the union.

On October 22, 1970, employees in the Detroit unit filed a petition for a decertification election to determine if BRAC still represented a majority of the members of the unit. A similar petition was filed by members of the New York unit the next day. Because of the existence of the unfair labor practice charges, the petitions were held in abeyance pursuant to the Board's "blocking charge" rule. A petition for a decertification election at the Duluth branch was apparently filed on June 4, 1971, during the pendency of these proceedings. The Board dismissed all of these decertification petitions.[1]

On November 3, 1970, the New York charges were withdrawn pursuant to a settlement agreement between NCR and the Regional Director and the required notice was posted. On November 5, 1970, the Board advised the union that it was dismissing the charges relating to Detroit and Duluth. The union, as the charging party, was not a party to the settlement agreement, and appealed the withdrawal and dismissal of all three charges to the General Counsel of the

---

* The Honorable TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. The New York petition was dismissed on April 15, 1971; the Detroit petition was dismissed on April 20, 1971; the Duluth petition was dismissed on April 2, 1973.

Board. On February 26, 1971, the General Counsel sustained the appeals of the union and the cases were remanded to the New York Regional Director for further proceedings. On April 8, 1971, the Regional Director in New York filed a complaint charging 8(a)(1) violations and consolidating the three cases, but did not charge refusal to bargain. In May, 1971, the union filed refusal to bargain charges as to New York and Detroit and then amended the charges to include an allegation of illegal unilateral wage increases. An amended, consolidated complaint was filed by the Regional Director on August 11, 1971, charging 8(a)(1) violations in Duluth, Detroit and New York, and also charging a refusal to bargain and illegal unilateral wage increases in New York and Detroit. It further alleged that the conduct of NCR induced employees to file decertification petitions in New York and Detroit and that NCR "attempted to induce" employees to file a decertification petition in Duluth.

Hearings were conducted by an Administrative Law Judge in New York, Detroit and Duluth, and his decision and recommended order were issued June 26, 1972. In that decision, the Administrative Law Judge found NCR had violated 8(a)(1) of the Act as charged; that there was not sufficient proof to show that NCR had encouraged or caused the filing of the decertification petitions in New York and Detroit; that there was no evidence to support the allegation of "attempting to induce" the filing of the decertification petition in Duluth; and that there had been unlawful refusals to bargain, together with illegal unilateral pay increases in New York and Detroit. The recommended order included the standard requirements of ceasing and desisting from further violations of 8(a)(1); a bargaining order as to New York and Detroit; and the usual posting of notices relating thereto.

On February 28, 1973, the Board issued its decision and order which upheld the determination of the Administrative Law Judge that there had been 8(a)(1) violations in all three locations and unlawful refusals to bargain coupled with illegal unilateral pay increases in New York and Detroit. However, it also held that this illegal conduct of NCR induced the filing of the decertification petitions in all three cities and thus the Board extended the bargaining order to Duluth as well as New York and Detroit. It is this order that NCR has petitioned this Court to review and which the Board has asked us to enforce.

*8(a)(1) Violations.*

The gist of the charges of coercion and restraint by NCR was two-fold. First, it was alleged that Peter Pampalone, a supervisor of NCR, had urged 15 of the over 200 TSR in the New York unit to have the union accept a one-year contract so that they could have the union decertified earlier; he outlined the procedure for filing a decertification petition and informed them they would obtain retroactive increases in pay by bringing about such decertification. Secondly, it was argued that during performance appraisal interviews at all three branches, NCR, through its supervisors who conducted the interviews, indicated that the employees would be entitled to raises under the merit plan then in effect in its nonunion branches, but that such merit increases could not be given because of the union contract then in effect at the three branches.

■ We have examined the record, including the testimony of all the witnesses set forth in the appendix and the Administrative Law Judge's decision, and reluctantly conclude that there is substantial evidence to support his determination that these acts did occur and that they constituted restraint, coercion, threats or promises of benefit in violation of the Act. We say "reluctantly" for three reasons: First, there are major disputes in the testimony as to what actually took place when the term of the proposed contract was discussed, *all* of which disputes were resolved in favor of the union witnesses. Secondly, a relatively small number of employees

were involved in this meeting and there was no proof that the matters discussed actually had any effect on either the term of the contract or the filing, later, of the decertification petitions. And finally, the determination that the remarks that were made in the performance appraisal meetings constituted threats, coercion, restraint or promises of benefit is highly speculative. However, the determination of the coercive nature of employer statements must be left, in the first instance, to the trier of facts, N.L.R.B. v. Virginia Electric & Power Co., 314 U.S. 469, 479, 62 S.Ct. 344, 86 L.Ed. 348 (1941), and his determination will not ordinarily be disturbed if there is substantial evidence in the record to support his determination. In balancing the countervailing employer and employee interests, a trier of fact

> [m]ust take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.

N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). We therefore grant enforcement as to the 8(a)(1) violations.

### Petitions for Decertification.

The Administrative Law Judge held that no evidence had been adduced at the hearing showing any involvement of NCR in the filing of the petitions for decertification in New York or Detroit, and that there was no evidence that NCR "attempted to induce" the Duluth employees to file a decertification petition. He therefore recommended dismissal of all of these charges. The Board, however, determined that NCR's "efforts in all three cities to demonstrate to the employees the advantages that would accrue to them without union representation had the intended effect of inspiring the decertification petitions filed in these cities. . . ." And it concluded "that the filing of the decertification petitions was both the intended

and direct product of the Respondent's misconduct."

■ Our examination of the record leads us to the same determination made by the Administrative Law Judge. There was absolutely no evidence, let alone substantial evidence, upon which the Board's determination could have been made. The only evidence on the subject was to the effect that NCR did nothing to encourage the filing of the petitions. The person who circulated the New York petition specifically disclaimed such pressure. He was not present when the supervisor was alleged to have discussed decertification procedures and testified that his information came solely from a representative of the Board. No person who signed any of the petitions for decertification testified concerning being present at the meeting of the 15 TSR with Mr. Pampalone or to being given a performance appraisal. The conclusion of the Board is based solely on an impermissible inference and cannot be upheld on the basis of the record before us. *See generally* Acme Products, Inc. v. N.L.R.B., 389 F.2d 104, 106 (8th Cir. 1968).

### Bargaining Order.

■ Section 8(a)(5) requires the employer to bargain in good faith with the collective bargaining representative. However, an employer may justifiably refuse to bargain with the union when it has a good faith doubt that the union represents a majority of its employees. Brooks v. N.L.R.B., 348 U.S. 96, 104, 75 S.Ct. 176, 99 L.Ed. 125 (1954); N.L.R.B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1091 (8th Cir. 1969); N.L.R.B. v. Arkansas Grain Corp., 390 F.2d 824, 828 (8th Cir. 1968); Terrell Machine Co., 173 NLRB No. 230, 70 LRRM 1049, 1049–50 (1969), enforced, 427 F.2d 1088, 1090 (4th Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970). In the absence of unusual circumstances and where a union has been certified as the exclusive bargaining unit, then under the "certification year rule" the majority status of that union is irrebuttably presumed for a reason-

able period, ordinarily one year after certification. Brooks v. N.L.R.B., *supra*, 348 U.S. at 98, 75 S.Ct. 176; Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 705, 64 S.Ct. 817, 88 L.Ed. 1020 (1944). After the expiration of the year or a reasonable period, the presumption of majority status continues, but is then normally rebuttable by a showing that the union no longer commands a majority, or by the employer's production of sufficient evidence to cast serious doubts thereon, in which event the presumption then loses its force and the General Counsel must come forward with the evidence that on the refusal to bargain date the union in fact did represent a majority of employees in the appropriate unit, N.L.R.B. v. Little Rock Downtowner, Inc., *supra*, 414 F.2d at 1091, or that the refusal to bargain was not predicated upon a good faith and reasonably grounded doubt of the union's continued majority status. *Terrell Machine Co., supra*, 427 F.2d at 1090; N.L.R.B. v. Arkansas Grain Corp., *supra*, 390 F.2d at 828.

■ Here the company sought to avoid its bargaining responsibility by interjecting a good faith doubt of the union's majority status. It grounded this doubt upon four factors:

1) the filing of decertification petitions in New York and Detroit supported by the requisite 30 percent showing of interest.[2]

2) the fact that fewer employees elected to have their union dues checked off than had done so a year previously. In the New York branch, checkoff authorizations ranged from only 25 percent to 38 percent of the total employees in the bargaining unit. The range in Detroit was broader, climbing from a low of 22 percent and peaking at a high of 46 percent of the employees in the unit.

3) employee turnover problems. Available figures indicate that in New York, a total for the year in question of 71 terminations of 222 employees was reported, slightly less than 32 percent. No testimony on the Detroit turnover rate was offered into evidence.

4) union resignations. Forty-seven letters from New York City employees resigning from the union were introduced into evidence by NCR. A total of 50 different signatures were received either by the employer or the union at that branch. Thirteen resignations were received from union members in the Detroit unit.

The law judge considered those elements seriatim and concluded that none of them individually would constitute a sufficient basis for a good faith refusal to bargain. While the Board's separate analyses are arguably supportable, when they are considered together we believe that good faith doubt has been demonstrated at least to the point of requiring the General Counsel to come forward with evidence that the union did represent a majority of the employees in the unit on the refusal to bargain date. This the General Counsel did not do.

■ Most doubtful is the Board's rejection of a permissible inference from the filing of the decertification petitions. Both of those petitions were supported by a requisite 30 percent showing of interest. That fact alone would justify an employer in declining to bargain further with the bargaining representative pending disposition of the decertification request, Telautograph Corp., 199 NLRB No. 117, 81 LRRM 1337 (1972), provided the loss of majority status was not attributable to the employer's own unfair practices. Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); Frank Bros. Co. v. N.L.R.B., *supra*, 321 U.S. at

---

2. The decertification petition filed by the employees at Duluth is not in evidence but there is some indication in both briefs that 14 of the 17 unit employees supported it. Ordinarily we would not accord any weight to facts not a part of the record, but here

the Board amended the Administrative Law Judge's recommended order to include a bargaining order for Duluth even though no 8(a)(5) violation was charged as to that branch and no proof relating thereto was therefore adduced by NCR at the hearing.

704–705, 64 S.Ct. 817; N.L.R.B. v. Little Rock Downtowner, Inc., *supra,* 414 F.2d at 1091 n.4. The existence of an unfair labor practice prior to the refusal to bargain interjects an element of uncertainty about whether the employer thus caused the possible loss of majority. But if it is shown the unfair labor practice did not significantly contribute to the loss of status, the employer may avoid a bargaining order. N.L.R.B. v. Nu-Southern Dyeing & Finishing, Inc., 444 F.2d 11, 15–16 (4th Cir.1971); Fremont Newspapers, Inc. v. N.L.R.B., 436 F.2d 665, 672–673 (8th Cir.1970); Ingress-Plastene, Inc. v. N.L.R.B., 430 F.2d 542, 547 (7th Cir.1970). We have previously held that there is not substantial evidence on the record as a whole to support the conclusion that the company's unfair labor practices induced the filing of the decertification petition. The record likewise fails to disclose any substantial evidence from which a permissible inference could be made that the unfair labor practices contributed generally to the possible loss of majority status by the union. Since the decertification petitions were supported by a showing of interest by the requisite 30 percent of employee signatures, NCR could properly base a good faith doubt of majority status upon the filing of these decertification petitions.

The remainder of the Board's analysis is more sound. Noncompulsory union checkoff authorizations have been held in other circumstances not to provide an adequate basis for good faith doubt of majority status, for employees for various reasons unconnected with their desire to have a union represent them, may fail to execute the checkoff authorization. N.L.R.B. v. Gulfmont Hotel Co., 362 F.2d 588, 592 (5th Cir.1966). Thus, there may be little relationship between the checkoff list and the number of union supporters. Courts have also held that employee turnover alone does not justify refusal to bargain. N.L.R.B. v. Little Rock Downtowner, Inc., *supra,* 414 F.2d at 1091; Printers Service, Inc., 175 NLRB No. 120, 71 LRRM 1078, 1079 (1969), enforced, 434 F.2d 1049 (6th Cir.1970). Nevertheless it is clear that a turnover in the numbers shown here could conceivably affect the majority status of a bargaining representative. Finally, reliance on decline in union membership alone has also been held not to justify a refusal to bargain. Medo Photo Supply Corp. v. N.L.R.B., *supra,* 312 U.S. at 687, 64 S.Ct. 830; N.L.R.B. v. Phil-Modes, Inc., 396 F.2d 131, 132 (5th Cir.1968). *But see* Collins & Aikman Corp. v. N.L.R.B., 395 F.2d 277, 283 (4th Cir.1968).

Nevertheless whether or not any one of the above factors would itself support an objective good faith doubt, it is not true that all reasons collectively would be insufficient. In Ingress-Plastene, Inc. v. N.L.R.B., *supra,* 430 F.2d at 546–547, the Seventh Circuit stated:

Athough the Board attacks each of the reasons advanced by the company in support of its good faith doubt of the union's majority status, the company does not rely on any one reason alone, but rather on all as a whole. We think the entire record, including evidence against the Board's position as well as in favor of it supports the company's position. We note that the union's majority has never actually been asserted by the Board and, in fact, is in serious doubt from the record.

(Citations omitted.) We agree with the reasoning of the Seventh Circuit and hold that, as in *Ingress-Plastene, Inc.,* the entire record shows that the company refused to bargain based upon a good faith doubt of the union's majority status.

*Unilateral Wage Increase.*

The Board concluded that the unilateral wage change granted by the company after refusal to bargain was an unfair labor practice. Unilateral changes may violate the Act. N.L.R.B. v. Katz, 369 U.S. 736, 745, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); N.L.R.B. v. Little Rock Downtowner, Inc., *supra,* 414 F.2d at 1092. However, where such unilateral changes follow a good faith refusal to bargain or where necessary to

maintain the status quo, then they are not violative of 8(a)(5). N.L.R.B. v. Ralph Printing & Lithographing Co., 433 F.2d 1058, 1062 (8th Cir.1970), cert. denied, 401 U.S. 925, 91 S.Ct. 883, 27 L. Ed.2d 829 (1971); McGraw-Edison Co. v. N.L.R.B., 419 F.2d 67, 77 (8th Cir. 1969); N.L.R.B. v. J. H. Rutter Rex Manufacturing Co., 415 F.2d 1133, 1135 (6th Cir. 1969); N.L.R.B. v. Little Rock Downtowner, Inc., *supra,* 414 F.2d at 1092–1093 n.6; N.L.R.B. v. Downtown Bakery Corp., 330 F.2d 921, 927 (6th Cir.1964). In this case our determination that there was no bad faith refusal to bargain requires us to likewise decline to enforce this portion of the Board's order.

For the reasons hereinbefore expressed the Board's finding of unfair labor practices based upon the supervisor's conduct in the meeting with 15 employees and the other supervisors' conduct during performance appraisals is affirmed. The Board's order pertaining to the posting of remedial notices relating to the 8(a)(1) violations is likewise enforced. Enforcement is denied for the bargaining orders for New York, Detroit, and Duluth and for the portion of the Board's order relating thereto.